Before you all step up, we have drafted and signed an order with respect to the amount of time on oral argument, so I'll just read it to you right now. Do you have copies of this? Okay, because it was just, I think, drafted the day before yesterday, so you probably haven't had a chance to get it. Counsel for the appellant's current title American on Boulevard Mortgage, five minutes. Counsel for Appellant's WW Funding and Wolfe, five minutes. Counsel for the Appellant Plaza Bank, five minutes. Counsel for Joseph Gambino and North Star Trust, 15 minutes. The replies by Krug's title American on Boulevard Mortgage, two minutes. The reply by Appellant's WW Funding and Stephen Wolfe, two minutes. Those are gentle admonitions. We understand the complexity of this case, the factual situation and so forth. We just ask you to keep these time constraints generally in mind because the questions may send you off and you'll be taking more than five minutes. It's more of a self-discipline than it is anything else. With that said, I wonder if all of the attorneys who are going to orally argue would step up and briefly identify yourselves for the record. Good morning, Your Honors. Let me please report I'm Donald Metzger representing the Coons Defendant. Mr. Metzger. Good morning, Your Honor. Christopher Carmichael on the Appellant Plaza Bank. Mr. Carmichael. Good morning. Mark Smith on behalf of WW Funding and Stephen Wolfe. Mr. Smith. And finally, is that it? No. Michael Braun on behalf of the NPO. Mr. Braun, you are the appellee. Very well. Are there any questions in terms of housekeeping that you need to address before we start? Yes. First of all, Jim Dasch, D-A-S-H, for Washington Mutual Bank and for Plaza Bank with respect to the so-called Etsy property. Yes, I have a question. Given the nature of the motion to allocate time, both at the end of the Washington Mutual and the Plaza Bank defendants would be way more alert with respect to the cross motions for sanctions. Okay. That is essentially the tail end of the thought, I think, of this case. Okay. If that's going to be the case, the only reason I'm here... Is because of that. Yes. Okay. So if I may be excused, in effect, both parties... You'd like to leave? Yes. You don't even want to stick around and listen? Mr. Dasch, you don't really need our permission. Since you asked for it, you're excused. Thank you very much. Unless the court has some... Does any members have any questions for Mr. Dasch? No. Okay. Thank you very much. Okay. You're welcome, Mr. Dasch. Thank you very much. Have a nice day. Okay. We start with Mr. Metzger. I think, Mr. Metzger, you can safely assume, believe it or not, that we've read the brief. Mr. Metzger, before you even start, your client is a sophisticated real estate man. Looking at those disbursement sheets, doesn't that bring a red flag? Did that... Pardon? Did that raise a red flag for Mr. Koontz? Yes. No, Your Honor. Mr. Koontz testified that there was nothing in the documents that appeared to be improper, that all were duly signed and notarized. I'm not talking about the documents. I'm talking about the disbursement sheets with commitment fees running into big numbers, with a law firm receiving money that had nothing to do with the case, with somebody's girlfriend getting money, people that they don't know, everybody's getting money and Gambino's getting very little. That doesn't raise a red flag to somebody who's sophisticated in the real estate business? I don't think so, Your Honor, for this reason. The transactions here were what were called hard money transactions, hard money loans, because Mr. Gambino, who was seriously and deeply in debt, was unable to obtain any kind of conventional funding. And, in fact, using his nephew, Defendant Salva Benedetto, was able to obtain these loans on what are called the hard money terms, where the loan fees and the transaction fees were significantly greater than any conventional assets. Well, I understand that, but what I don't understand is on the disbursement sheets he gets little or no money. I mean, why would he enter into a transaction, give up his properties when he's getting nothing for it? How does that happen? He got substantial money, either indirectly or through payment of his debts. For example, in one of the transactions, Gambino's debt of $40,000 to $50,000 in real estate taxes. Well, real estate taxes were paid to clear the title for the sophisticated people who were investigating. I don't know what advantage that is to Gambino. I mean, why would a man go sell properties when he's getting nothing? You know, the money goes to Sal, to NCO, to a girlfriend, to somebody's lawyer. Nobody looks into these things. Your Honor, Mr. Koontz himself made loans to Gambino through Sal, over $150,000. Well, Koontz didn't talk to Gambino, did he? Did he have a conversation with Gambino ever? He testified that there were several interactions with Gambino. There were some phone conversations with Gambino's office involving Sal and NCO, where he could hear the three of them talking. He received... Well, Gambino was not present for any of these closings, was he? No, as far as I know, he was not. Mr. Koontz even received faxes from Gambino with respect to a couple of the transactions. He received an insurance binder from Mr. Gambino in one transaction. He received an affidavit of title from Mr. Gambino. But from the perspective... Purportedly from Mr. Gambino. Correct. Purportedly from Mr. Gambino. I mean, actually all the notaries and everything was a bunch of forgeries. Sophisticated real estate man doesn't see the red flag anywhere. Is this what you want us to believe? I do want you to believe that, Your Honor. Well, and when we're looking at the trial judge's findings, can we say that no rational prior fact would agree with the trial court's findings when there's testimony overwhelmingly about forgeries and there's nothing to contest that those were outright forgeries? No other evidence to suggest that those weren't forgeries? We're going to be able to reverse on a manifest weight standard? This was a bench trial, was it not? It was a bench trial, Your Honor. No rational prior fact. Pretty steep hill. Perhaps it is. But I think we need to sharpen the focus here on what it was that there needed to be evidence of with respect to my clients, the Kuznicki. My clients were found to be liable for slander of type. And there are certain elements of slander of type that would have to be established by the evidence. Two of them are of a special significance here. One is publication and the other is malice. And I would suggest that you can read through that transcript several times, as I have done. I wasn't a trial attorney. And you can read the findings of that court over and over again. And there is no evidence and there are no findings to establish the elements of slander of title as to the Kuznicki's defendants. There clearly were anomalies in the transactions. The transactions were certainly unusual transactions as far as we know. I'm not involved in hard money loans, so I don't have that experience in my life. But these were not conventional transactions. But they can't be removed, to digress for just a moment, they can't really be removed from the context of Gambino's situation and Gambino's obvious involvement repeatedly in these transactions. But as for the Kuznicki's defendants, as I said, there is no evidence that any act that they did constituted causing or participating in the publication of any disparagement of the title. Well, wait a minute. You say that there's no evidence of malice. And that's the other point. There's no evidence of malice. They're dealing with Enzo and Sal. These people don't have jobs, do they? They don't work for anybody. They don't have any source of income except, I guess, relatives. Yes, we have the testimony as to their sources of income, how they live. Enzo had been working in the automotive business and left to get involved with his uncle, Joseph Gambino, in Gambino's automotive garage. We do have, there is testimony that Sal didn't have employment. He worked on putting deals together. He didn't have a bank account, for example. And he transacted his operations in cash. But we have testimony that a real estate man is going to deal with somebody like this without going investigating further, and that's not malice? Certainly not. Malice means, in the context of slander of fact, malice is having knowledge that the documents are false, or a high degree of awareness of their probable falsity, or serious doubts as to their truth. Well, what about the... There is no indication in evidence as to... What about the leases that Preet dated? What about that? Sal, remember that Coos and the Coos defendants were... Did he own the property when, in 1995, he did? Right. It's fully explained and discussed in the briefs, but my recollection, to answer your question directly, is that the documents for the transaction were brought to Coos. Coos was simply closing these transactions. He wasn't involved in making the transactions, in preparing any of the documentation for the transactions. In fact, there really was never any evidence that the documents, which were found to be inauthentic, were used in the transactions. It was kind of assumed by everyone. But you can go through that record repeatedly, and there is no evidence of use of those documents, and they weren't even admitted as being used in transactions. Did he actually own the Laverne property when he claimed he had acquired it in 1995, or is that actually untrue? Well, it's not correct. I wouldn't say it's not true. It's not correct. His testimony was that was a mistake. There was no reason, and there was no reason for him to say that, because the title was transferred to him, and preceding his obtaining of the loan for the transaction, so that it could be done as a refinance, which was a more favorable loan than a purchase one. And he was acting as if the refinancing were for his own property when in fact it wasn't. He was acting as if he was refinancing. How did he explain that? How was that incorrect or correct or whatever? That was explained by the testimony that he was advised by the lender, Equity Plus in that instance, that as long as he had title, before or at the time of the loan transaction, it could be done as a refinance. So he could... But he didn't in fact have title. He did when the loan was made, because he received title by receiving the trustee deed that transferred title to him. And in fact, we cite the case. I don't remember the name of the case. It says a party can enter into a contract for real estate when he doesn't own the real estate, as long as at the time of the transaction, the real estate is owned. And that corroborates exactly what Mr. Koontz testified his lender had told him, Equity Plus. As long as he was taking title. But there was no reason to skew any of the information, because he didn't need to have title in 1995. That didn't matter. He was receiving the transfer of title right then from the Gambiano Trust. Well, you were talking that these documents, you know, weren't even used in the transactions, and that there's no evidence of that. You know, my reading of the record, you even acknowledged that in your verified answer. You ought to look at your answer to this. You're saying that we acknowledge... Yes. Yes. Yes. Yes. But that's besides the point. Go on with your argument. It's very interesting to me. Well, I understand the court's concern. These are... These are concerns. I'm very concerned. This is a lawyer who has a license. Yes. This is not just a case. I understand. This is an important thing here, what was done here. But go ahead. Proceed. It's very important to Mr. Koontz as well. And perhaps in... Is Mr. Koontz's license very important to him? Extremely important to him. All right. And he's already lost his ability to act as a real estate broker individually because of the judgment he was required to... I don't know the details, but either his license was suspended or he had to turn it in or something like that. So he couldn't do that. I mean, this is very damaging to Mr. Koontz. But he relied on Sal, who had sent some prior real estate closings to him and sent these closings to him as well. And his role, I think, needs to be understood as being a party. Well, should everybody else have seen through Sal except Mr. Koontz? Is that what you're saying? Everybody else could see through Sal, but I'm the experienced, sophisticated... No, I did not say that. ...real estate attorney slash real estate investor. Everybody else could see through Sal, including the judge here, but not Mr. Koontz. Well, we're assuming that people saw through Sal or that the judge saw through Sal. But there was no evidence and no determination, I must say, that Sal was the instrumentality of these transactions. And I think it's quite... He was or was not? There's no evidence that he was. There's no evidence that he was never determined. But Mr. Gambino was never in the picture, so who was in the picture? Mr. Gambino was in the picture throughout. That's what the judge already was. I was going to segue into that line of questioning because Plaza Bank brings it up too. Yes. Let me ask you a question just specifically about who testified to what, and I'm referring to paragraph 5 on page 19 of your brief. Which brief? You allege, and apparently it is not disputed, that the property was taken... The three properties were taken out of trust by Mr. Gambino himself. That's correct. Okay, so let's go back to where this all starts. Nothing could have started. No money could have been loaned. Nothing could have occurred until Gambino took these properties out of trust. I think that's pretty much agreed by everybody, right? Nobody disputes the fact that he took the properties out of trust. Right? Is that correct? Well... Or is there a dispute about that? No, no. The properties were taken out of trust. What I think is significant... Gambino told the young lady at North Star Trust, Maritza Castillo... No. ...that he took the properties out of trust so that he could finance them in his own name. That's correct. Nobody disputed that? Nobody disputed it. Okay. But there is a troubling aspect. I know. It gets more complicated. But I just wanted to go back to the beginning because the allegation here throughout by most of the defendants is that Mr. Gambino was a willing participant in all of this, although his fingerprints aren't anywhere to be seen, other than early on when he took the properties out of trust. Then it becomes a question of he said, she said, they said, we said. Well, to some extent. Am I oversimplifying? Well, I think so because in terms of the he said, she said concept, I think it's not the evidence that's it. And that's one of the problems in this trial. It was with a plaintiff's attorney. And I think the court had a great deal of difficulty separating... We had a problem because the original plaintiff in this case was dead. And was dead at the time that this case was tried. That's correct. All you had basically was his discovery debt was interrupted by his death, right? That's what I understand. I wasn't involved. But listening to the court and reading through the transcript... Well, let me ask you this. Could I just at least pick apart some of the things that you say are against the manifest way? The trial judge said that Kuntz refinanced the Laverne property even though he did not own it. Now, was that incorrect when she said that? Or was that correct? It's not correct. Okay, the evidence doesn't support that at all. No, it doesn't. All right. Now, he listed himself as the owner, submitting an application stating he had owned the property since 1995. A fact that she said was demonstrably false. Incorrect again. It's correct that it's false that he owned the property since 1995. It's true that it was listed, stated that way. But he testified that it was a mistake and there was no purpose for doing it. Did he say the 1962 date was just a typo? He knew nothing about that. He was three years old in 19... All right. Well, then how did he explain it? He explained that that was a document. It was a trust agreement that had a 1962 date that was faxed from Gambino that was with the documents at the closing of the transaction. He did not know where it came from or what the purpose of it was. And I would have to agree with the court that it was certainly not careful conduct on the part of Mr. Jones to allow that document to be used. But I think we all know... What about the fabricated lease? Was she completely off base on that? I think so. I think she's rather off base on that because with the title being transferred to Mr. Cooks, the idea is that he was able to get a loan and get money to Gambino. He was going to hold title for a year and then Gambino would be able to, in effect, pay off the loan and get the property. But during that, and it's my understanding, is that during that period of time where Mr. Cooks is entitled, there are leases on the property. Now the rents continue to be collected by Gambino and it's one of the few things that he actually reports in his tax return that he collected the rents. But the leases... I'm sorry. Getting back to this Niles transaction where it's undisputed that he took the properties out of trust himself and got deeds. It goes on to say, and again I'm referring to your brief, you say, according to this record, Sal, the infamous Sal, arranged for an appraisal of the Niles property for which Enzo wrote a check. Who testified to that? Do you recall? Because you cite to the record, but you don't cite who said it. I don't. I'm sorry. I don't recall. Gambino took the appraisal through the property. Gambino took the appraisal through the property. Now that's in the appraisal document. Okay, but who testified to the fact that Gambino did it? Enzo. Enzo?  I don't... You don't recall who testified to that? It's in the record. It's in the record. I mean, we can find out who did it. Yes, I think I recall who testified. My feeling is that it was probably Sal who testified, but the appraisal document itself was presented and the appraiser wrote that Gambino took him through the property. Right. It was the appraiser who said that. Correct. He testified to that. Okay. Correct. So that's independent testimony from someone not involved in the transaction. To finish the question about the leases, Your Honor, so that Koontz was going to be entitled. So it's my understanding that these leases, which were in existence, were brought to him, which he believed from Gambino, that Sal is the one who's shoveling everything back and forth. And so he signed, I believe it was he who signed the leases, because he was entitled. So the idea was to, I think, just to perpetuate the leases. Who received the money? Koontz or Gambino? Gambino. Okay. Koontz, from all of these transactions, Dennis Koontz, Boulevard Mortgage, Title America, those two companies were businesses that Dennis offered, received about $6,400. That was the total. That was the total in all these transactions and the fees that he received. He loaned over $150,000 to Gambino through Sal. Through Sal. He thought he was loaning it to Gambino through Sal. The checks weren't made out to Gambino. I don't. They may not. The checks were made out to Sal. Were the checks to Sal? Yeah. I mean, is that something a sophisticated real estate person does? It's certainly not, Jim. But the accountant who was advising Gambino and handling his IRS problems. That the money not be shown up as your money. Correct. Because there would have been a brick put on it by the IRS. Correct. They were clearly playing the IRS. So everybody involved at this point was involved in a conspiracy to deprive the IRS of the taxes. I can't say that, that there was anyone involved in that other than. Well, you know, if you are aware of the fact that you're writing a check to X, but the money is really going to Y, and the reason it's not being directly going to Y is because the IRS is looking into it. And you write the check to X. Have you not committed a federal crime? I don't know if you've committed a federal crime, but I certainly understand the meaning of the court. But there's nothing that indicates that Dennis had making. I wouldn't want to be in front of a federal grand jury having written those checks if it could be shown that I was aware of the fact that the reason I wrote them to X instead of Y was because Y had federal tax liens on it. I understand. There's nothing that indicates any kind of... Isn't that an obvious conclusion that the trial judge could have come to, listening to this testimony? The reason that the checks were written to Sal rather than to Gambino was... Now, this doesn't absolve Gambino from being aware of it. I admit that. There's a possibility, at least that's the implication in this very able brief that was prepared by the Plaza people, that Gambino knew about all of this and was a willing participant in an attempt to defraud the IRS of taxes. But everybody else was involved too. Well, I don't think so. I think that actually everyone else, with the possible exception of Sal, because we just don't know, was also defrauded by Gambino. I think that's what the court missed here. And that Gambino was really the trigger for everything. Where did the disease come from? Well, it's easy enough to accuse him of being the trigger because he's dead. Nobody had a chance to either put him on the stand as an adverse witness at this trial. That might have been a very interesting direct examination. But before he died, he had given a portion of his deposition and he had made several admissions along those lines that are shown in the record. And particularly with respect to the Niles transaction, one of the briefs, I believe it's the Plaza brief, makes that very clear that his fingerprints are all over the Niles transaction. Well, they are. And the implication, of course, is that if his fingerprints were on those, his fingerprints were on the others as well. Well, but there are fingerprints on the others as well. It doesn't need to be inferred because there is evidence of interaction. Justice Gordon makes a very good point. I mean, Mr. Coates, in addition to being a real estate broker in this particular case and facilitator and loan maker, was an attorney at law. That's one officer of the court. And if he was aware of any of this, he's got a problem. But in any event, that's for another day. Anything else you'd like to say? Other than the fact that the evidence simply didn't show that there was... Publication or... Slander of the house. And that the North Star people themselves testified that there was no way anyone who was not involved in the separation of those deeds could tell whether they were in or out. There's no way. And obviously, they were North Star trustee deed forms. How were they made? I think this is sort of like the great film Rashomon. Well, not exactly. Where we're... I'm not sure that's a very good metaphor. Where we're... I take your point. We need to really move on, though. Do you want to sum up your argument? I think you've summed it up for me. That whatever anomalies or inconsistencies or poor judgment may have been involved on the part of the Coates defendants, that there was no evidence and no findings that they caused or participated in the publication of disparaging documents or that they knew or had a high degree of awareness or serious doubts as to the authenticity of the documents. Okay. Thank you very much. Thank you. I believe Mr. Smith, you're next up on behalf of W.W. Funding and Stephen Wolfe. May I please record, counsel? My name is Mark Smith. I represent W.W. Funding and Stephen Wolfe for purposes of this appeal. Initially, I'd like to point out that Mr. Wolfe had a reasonable basis for believing that the documents were genuine. These documents were signed. They were notarized. He paid about $750,000 in the two transactions, one to 21st Century and one to Mr. Gardino. The documents were accepted. Wait a minute. Wasn't he also a sophisticated real estate investor?  Absolutely. These documents, though, signed, notarized, acceptable to the title companies, the banks, and the attorneys. It's not unlike any other transaction where a seller does not show up at a closing. And interestingly... How about the disbursement sheets? I mean, did we just... There's no red flags there. We didn't see the disbursement sheets. The HUD bond settlement statements that show up at closing, those are different. Those don't show anything going anywhere other than to Mr. Gardino or for Mr. Gardino's benefits, let alone the fees and expenses and other things. How about the checks to South? Those were not at closing. Those were not part of the closings. They weren't part of the rest of the statement? I don't believe so. I'll have to take a look again. There may have been one or two, but they would have been small. And I believe one of them was for reimbursement of a water bill. Nothing directly to South? Not to his attorney or to his girlfriend or anything like that? To the extent that there may have been something on the HUD bonds that went other places other than directly to Mr. Gardino, there is no showing and no way that there is a showing that Mr. Wolf would have known that these things were anything other than for the benefit of Mr. Gardino. Did Mr. Wolf ever have a conversation with Mr. Gardino? He testified that he had two different meetings with Mr. Gardino. But the trial court didn't believe that, did they? That is correct. The trial court, despite the lack of conflicting evidence, despite the fact that there was, unfortunately, South, who testified at the trial concerning the second meeting, there was an addition documentation that came in after trial with respect to the second meeting. But yes, you're right. The trial court did not believe that the second meeting had taken place. The trial court essentially found that there were three reasons for believing that Mr. Wolf had acted recklessly. One of them is that the court rejected the idea that Mr. Wolf had met with Mr. Gardino. Twice. She said she was focusing on once or twice. Well, yeah, but according to the testimony of Mr. Wolf, he had two meetings. Yes, but the judge only dealt with the second meeting. What's interesting about that is the context of the court's decision with respect to that. The court found that it demonstrated reckless disregard because it was jail and not an attorney who was transferring documents in the trial court's words, standing in for Mr. Gardino. The court stated that Mr. Wolf had advocated the meeting with Mr. Gardino in order to cover up this particular issue. But what's interesting is there are a couple of things. First of all, Mr. Wolf knew how these documents were transported. There's no showing that somebody else survived that. He was sitting there anyway when the documents came in. Second of all, this is not a case where Scott was actually sitting in for the owner. Scott was not signing documents on Mr. Gardino's behalf after closing. They were already all signed. Yes, they were. Already forged at that point. They were all signed. All were. Well, no, I mean, there's no question, is there, that they were forged? I thought that there's a clear, there was testimony. Is anybody contesting that? They're contesting their knowledge of the forgery. Correct. But no one's contesting that the documents were signed by Mr. Gardino. Absolutely. But these documents were acceptable to the attorneys, they were acceptable to the title companies, they were acceptable to the banks. Northstar, as Charles has just said, Northstar Trust people said that if you look at the forged documents, there was no way to tell from the face of the trust documents that these things were forged. The second thing is, excuse me, I'm sorry, that as far as standing in for the owner, it was himself. Mr. Wolf testified his understanding that Mr. Gambino was being represented by Mr. Phillips. And again, there's no conflicting testimony. To the contrary, the testimony that plaintiffs brought out of trial was consistent. Mr. Frenchel, who was the attorney in one of the earlier transactions, testified that he thought that Mr. Coons was representing Mr. Gambino. The trial court did a comment that Mr. Coons held himself out to be representing Mr. Gambino. That being said, from Mr. Wolf's perspective, and testifying as well, that he thought Mr. Coons was representing Gambino, it was as if there was any other closing. But the red flag again is the way, the peculiar, well I'll strike the word peculiar because that's editorializing, the way in which these loans were structured right from the beginning, which seemed to indicate that all of the parties, all of the parties, at least who were directly involved in the transactions, believed that they were being structured in this way in order to conceal Mr. Gambino as the ultimate beneficiary of the payouts. That may be with respect to the Gambino, Mr. Gambino, Mr. Danos, Mr. Coons, I couldn't tell you. What other rationalization would there be to convince Mr. Coons and Mr. Wolf to go along with payouts that didn't go directly to the man who owned the property? Mr. Wolf is not aware that the payouts were not going directly to him for the benefit of the man who owned the property. If you look at the transactions, Wolf and WW Funding ran on the second set of transactions. As far as they knew, Wolf bought one property. So all of the reimbursements in this case were made out to Joseph Gambino, is that what you're saying? No, I'm not, I'm definitely not saying that. Okay, well then they were made out to whom? Others ostensibly on his behalf, for his ultimate benefit. That was Wolf's understanding. And there's nothing untoward, unusual, different about that from every other closing? No, there's nothing in the face of the Humboldt-Sullivan statements which would demonstrate anything. Now wait a minute, there's a problem here. Wait, wait, wait. Wolf testified that prior to granting Coons the option, he had a meeting with Gambino, right? At that point in time, he had an outline of the agreement between WW Funding and Coons in his possession. And Gambino. Okay, why did he have Gambino sign off on it? A sophisticated man of real estate for 40 years, and he knows that this guy has some interest here which he cannot determine. That's why he's having the meeting. He shows him the agreement, and he doesn't have him sign off on it. Why is that? I don't know that the option agreement was prepared at the time of the meeting. I don't recall that specific testimony. I do know that there was a contract for the purchase that Mr. Gambino had ostensibly signed already, which was a matter of pre-dating this meeting. He testified that he had an outline of the agreement, and he did not have Gambino sign it to indicate his assent. Okay. I don't believe it was an outline of the option agreement. I think it was an outline of the agreement generally, which was... It was on the Ketchy property. No, we're going to buy this property. We're going to give you a time period to buy it back. There's the interest rate. There are the fees and costs. I don't think they were talking specifically about... I mean, then when problems arose concerning the Coons option, he did contact Gambino. No, he contacted Sal and Coons. Right. I mean, he knew Gambino was the man. Yes, but two things. He was told that Sal was the one he should operate through, and that's not just Mr. Goldberg, nor is that just the finance witnesses. That was also the finance witnesses. Mr. Pritikin was specifically told in testimony, you get to deal with Sal with respect to the financing. How did Gambino testify to a meeting with Sal, Enzo, and Mr. Gambino? And Mr. Gambino tells him in that meeting, I said Sal outdoor. I told these people they could deal with Sal. Sal was acting for me in getting the answer. Wolf is not in any better position to either believe that Coons is not representing Mr. Gambino or to know that Sal is not authorized to act on Mr. Gambino's behalf. You properly go back there to the fact that Mr. Wolf is an experienced investor. My question would be, as an experienced investor, if he thought these things were suspicious, if he had a high degree of suspicions for following the law, why did he do it? How could he possibly get out of the transactions at the end of the day? He's spending almost $750,000. The only way to get out is to sell the properties. Well, he knew Gambino, when he had his meeting, wasn't being represented by a lawyer. No, that's not what he testified to. No, no, I think he testified. No, I know what he testified to. I read it. Maybe three or four times, I read it. But if I may finish, A, he believed that Mr. Coons was representing Mr. Gambino, but how would Mr. Wolf, having a suspicion that these properties are being, the documents are being forged, get out from under the debt he's taking on to buy the properties? He's got to resell them. And Mr. Gambino is operating one of these properties. So what does he do? He would have for sale signs, listed for sale, have people tracing through there, and Mr. Gambino says, I'm sorry, why are you doing this? Maybe he thought that Gambino was an easy mark. He wouldn't make any complaints. He had all these documents, and that would be the end of it. Gambino would be silenced. Mr. Gambino was not silenced. Mr. Gambino, Mr. Wolf's knowledge. And again, this is all based on Mr. Wolf's knowledge. And part of the problem we're having is two-fold. One, we're looking back retrospectively and saying, given what we know now, why don't you do something different then? And the second problem that we're having is, I think, something that the trial court did also. The trial court looked at all of these things going on and grouped all of the defendants together and said, you're all basically doing something to take away this gentleman's properties. But the problem is, there was no evidence of conspiracy. There's no proof of any agreement. There's a complete failure with respect to the three things the trial judge said, indicating from Mr. Wolf's perspective, that Mr. Wolf acted recklessly and should have known in retrospect that there was a problem with the title documents. But there was no evidence. One of them was that she said that Wolf and Kootz were involved in these things, these transactions, together. Everyone's read the record. I've asked counsel to identify. Where in the record does it say that Kootz and Wolf had anything to do with each other? Even the options written, the evidence regarding the options, not that Kootz talked to Wolf and said, do it this way. It said so. Director Wolf telling Wolf, this is what Mr. Gambino wants. Mr. Wolf says, OK. It makes sense, because even though Mr. Gambino has $2 million in net assets, he lacks cash flow and cannot get conventional financing. Ostensibly, Kootz, representing Mr. Gambino, has the ability to get that financing and take Mr. Wolf out at the end of the year. Everyone who testified on the defendant's end who did have anything to do with this transaction said the same thing. Wolf was there as a lender, an intro lender. He was to repay the monies on Kenzie and Vanell's property. And then he was going to get taken out. He had nothing to do with anything. So what did Wolf do that was wrong? In retrospect, I can tell you, yes, perhaps it was negligent. Maybe he thinks he would have been done differently. But to give Wolf, at the time of the transactions, this heightened suspicion that these title documents were forged, when there's nothing in the face of the documents and nothing in the transactions and no evidence supporting the court's conclusion that Wolf and Kootz were together in anything. I don't think the court found any conspiracy here. So, no, she did not. Which is important. I don't think that that's an issue. No, but whatever these defendants were doing, which was wrong in that of our command of France, cannot be laid on Wolf's doorstep merely because he happened to be sitting at the same defense table. I don't think anybody's doing that. I think what they're doing is that there were red flags here that a sophisticated investor would know and that this man knew and he was taking advantage of his position. I think that's what the evidence, this is the way the court, the trial court conceived the evidence. The court said that there were only three things with respect to what the defendants stated in that process. One, that there was a non-attorney standing in for the owner, which we talked about before. Two, that Wolf and Kootz were involved in the transactions together. But we're just discussing. There's no evidence in the record that the two had anything to do with each other. And the third thing that the court found was that the action of Kootz, rather than Mr. D'Ampito, who we discussed that too. Other than those three findings, there's nothing in the action, nothing in the trial court's determinations, that sets out what it is that Mr. Wolf did wrong. How would we give you relief, as opposed to the other defendants, if we assume that there was no interrelationship, as the trial court found among the various defendants? Just concentrating on your client, what would be appropriate relief, as far as you're concerned? For purposes of the appeal, it would be vacating the judgements. On all three properties? Oh, no. Okay. Well, tell me precisely then, what form of relief would you request? The vacate the judgements, as the Wolf and WW funding would respect the slander of the title. Okay. That's it? Yes. Okay. What would be the practical effect of that, in terms of title to the properties? None. It would not affect anything that the trial court did with respect to title to the properties. Okay. I know that the banks have a different… I think they do. We're going to hear from one of them next. But in terms of the practical effect on the disposition of the properties and title going back to the estate of Mr. Gambino, it wouldn't have any impact at all. It would just remove the slander of title count directed at your client. Correct. Which were the basis of the punitive damages. Correct. I don't know if I have any additional time or not. We do need to move on, though, because we need to hear from at least three more people we need to hear from. Mr. Carmichael, is it? Yes. You're next. Thank you very much. You set out pretty specifically in your brief what relief you requested on behalf of Closet Bank. I guess that's pretty clear. In your brief, anyway. Go ahead. Yes. Your Honor, on behalf of Closet Bank, we believe that denial transactions, trying to focus in on our brief, is different in this instance. First of all, he got $70,000. That's undisputed, isn't it? Yes. How did that money come to him, though, specifically? How did the $70,000 end up in Gambino's pocket? Was it a check written to him? There were two checks written for two different amounts. And there was also cash that he had received. When did he admit that, during his deposition? How did that get into evidence? Well, he admitted it in a bunch of different places. The dollar amount he admitted in the criminal trial. That's not in dispute? No, it's not in dispute. In fact, I think it's also in all of his complaints that he received. $70,000 on the Niles transaction. Well, how could he argue that the dates were forged without his knowledge if he accepted $70,000? Maybe that's a question I should be asking his lawyers. Yes. For the Niles transaction, that's a serious question. That is different. You asked before about showing the appraiser around the Niles property. Gambino testified to that. Transcript 1596 of the page. That's Gambino's testimony? Yes. He admitted to it in his deposition. And the binder on the title insurance, that was also something that he initiated? The binder on the title insurance? Right. I'm not sure about that specifically. I know about the appraiser. Okay. That's undisputed as well, right? How did that get into the record? Nobody's objected to it, so obviously it's in the record, right? Okay, but who introduced it? Do you know? Okay. He retracted his first denial of having taken the deeds out of trust. Okay. But in his first amended verified complaint, he denied it. Yes. He actually affirmatively says, I never took the deeds out of trust. And the testimony and those verifications, I think, are very troubling. And they're very serious because he's a plaintiff in the court asking for relief, and he's misleading the court as to a very serious issue. And I believe one of the reasons that he does that is because there are these issues with the Niles transaction. So, you know, Mr. Gambino is here pretending as if he knows nothing about anything. I've never really met Sal and Enzo, seen them a couple times at family functions. I don't really know what's going on here. People are stealing my properties. But we know from Tom Gambino, who's disinterested, nobody's shown that Tom has any own pick of anybody, that there was an admission, yeah, that there was some type of deal going on. Where the deal went off the tracks, I don't know. But there was some type of deal going on here with the Niles transaction. We've got him taking the deeds out of trust. We've got the Niles, the false deed that doesn't bear his actual signature, is a mirror image of the deed that he took out of trust. When you say mirror image, exactly what do you mean by that? I mean, they're almost identical, except for the fact that the signature's forged. The forms are the same. The forms are the same. I don't know where you get those, except through Mr. Gambino after he takes them out of trust. What's your best argument, that Gambino did not have unclean hands? Is that your best argument? Well, that he, what do you call it, unclean hands, that he ratified the transaction by accepting the funds from it, finding out about it. Well, he accepted some funds. He did accept some funds. Some funds. So, I mean, how is that a ratification? Well, it shows that he had knowledge of the transaction. Why, because somebody gave him some money and he took it? That means he had knowledge. Well, he's also shown this, the mortgage later, when Zipperstein files suit, and he appears pro se. But then he hired a lawyer to defend the case, and then they paid off the mortgage. So, I don't know what kind of ratification that could be. Well, that this is the same mortgage that he claims he's never seen and has no idea of years later, that there's a serious issue. He's shown what's supposed to be a false mortgage. He doesn't clear the title. He says that this mortgage is being paid off. That's very different than saying this mortgage is fraudulent. I'm going to sue you and clear the title. So, he's got a fraudulent mortgage account here, according to him, and he actually allows it to be paid off. How does he allow it to be paid off? Somebody paid it off? I mean, if somebody files a foreclosure action against you, and you hire a lawyer to defend it, and then somebody dismisses the case, what are you supposed to do, reopen it? If it were my mortgage? If somebody said they had a mortgage on my property? Yes. Okay, you would reopen the case. You need to find out if somebody says they have a mortgage on your property that you claim doesn't even exist to just allow it to be paid off after that. That's highly unusual. Okay. Anything else? You've written, I read this point, you've written a very able brief with respect to your position, so I think we can understand that. Is there anything you want to stress or emphasize within that brief? I think you have to actually, I think the Niles transaction is substantially different than these other transactions. I understand the grave concerns about the overall issues that happen here, what happened, the fact that money for the other transactions doesn't trace directly to Campino. I understand that there are those serious concerns, but at the Niles transaction, there are a multitude of different things that make it different that should cause this court serious concern and to grant relief to the press, which is just pre-established. Okay. We're going to give each of you a brief, a very brief opportunity to respond after we've heard from the plaintiff, Apple Leaf, and they're up next. Counselor, you're Mr.? Braun. Braun. That's Mr. Weiss. That's Mr. Weiss. Forgive me for not recognizing the two of you, but you do kind of look a little alike. Right. I want to address the point you raised concerning Mr. Gambino took the properties out of trust. Let me focus on that. The testimony of the trial, so found by the trial judge, was that early on in the transaction, Mr. Gambino goes and presents them to the trust officer, says, I'm refinancing my properties. They need to take a look at some deeds. That's undisputed, right? That's undisputed. Pulls those deeds out, shows them to Scott, but nothing happens. He takes those deeds back and cancels them. How soon after he took them out? Within a month. Nothing had happened in the interim in terms of financial transactions or loans or anything? As far as he knew. As far as he knew. He canceled those deeds. When he says he didn't take them out of trust, he was being truthful. He never did. He canceled those deeds. All right. I'll read you what they are. Let me ask you this. Sure. There's a claim here that Gambino did not have clean hands because Gambino did receive some money and he admitted that he received some money here, that he was attempting to get around the Internal Revenue Service. So what is your argument? How does he have clean hands here? The money that he received, he believed, and it's alleged, were loans from Sal. He thought it was being loaned money from Sal. He had no idea where his money came from. As a matter of fact, the source of that money was in disguise because, in fact, it came from his own properties. And he didn't know? He didn't know. The checks were directly deposited into his account. Why would Sal loan him all this money? In order to basically keep the deal going. Keep what deal going? The deal going in order to utilize his properties, Mr. Gambino's properties, for Sal. But Mr. Gambino was unaware of this. He was unaware. Why wouldn't he even question Sal being so generous in loaning him money? Because Sal explained, look, we've got this deal going. We're going to buy all your properties. We're going to work it all out in the back end. Don't worry about it. We'll deal with this later on. That was the testimony. So he was just a naive, unsuspecting owner of the properties who was being duped by his nephew. He trusted, initially he trusted. Take a look at the testimony regarding his meeting with Tom Gambino, where Sal goes through his funding as well. He can put it into trusts. He can do this. He can do that. He can do all these things. That's what Sal told him. It was just a confetti of lies, and Mr. Gambino had no way of understanding what the heck was going on. He said, at this point, I need my property back. I don't know what the heck is going on. Is there any difference between the Niall's property? Let's talk about the Niall's property for a half a second. First of all, all the trustee fees that are issued in this case, reports, all three of them, the trustee fees that are supposed to convey property to Mr. Gambino, forgeries. We know that, but what about Tom? Well, there's one question I have about the forged deeds, and it simply goes to the fact that there was testimony by the handwriting agent that the exemplars for determining the authenticity of Mr. Gambino's signature were supplied to her by him. Is that true? That's true. Also, was there a check supplied? Yes, there was. But everything that she used to make a comparison between the signatures on the deeds and his actual signature were supplied by him. And it was exemplar things that covered a significant period of time, and were many in number. Nobody on the other side called an expert witness with respect to the handwriting. No, they did not present any expert testimonies at all. To conflict with that. Right. The only possible rebuttal to this is forged. Well, they could have come up with another handwriting expert that said they weren't forged. I suppose that they could find them. They could have. But if you look at these things, you can see they were forged. Well, what do you mean, you can clearly see that they're forged? You can look at them. That's not what the position of the defendant is, is that even though someone may say that they were clearly forged and they're not contesting that, to someone who doesn't know the signature, how would they know they're forged? How were they intimately involved with Joseph Gambino to know his signature from another? I mean, that's not the same thing. Having testimony that says they're forged isn't saying that the individuals who accepted the documents have knowledge that that was not Joseph Gambino's signature. Do you see the difference? Absolutely. And that's why you have to look at the circumstances of the transaction, which the trial case does. For the Niles property, which Gambino admits he got the $70,000 for, not everything is the same here. Not every defendant is the same, and so how do you reconcile this Niles property and just throw it into the pot with everything else? Well, first of all, the Niles property, more of it is not an issue because it was paid off, so that's really not what the clause is talking about. They're talking about another transaction a year and a half later. But with respect to the Niles property, there's no evidence that Mr. Gambino knew where that money came from. Only that it was supplied to him by South. Supplied by South, found him with $70,000, forged his name, by the way, his endorsement on the case was $70,000, and, by the way, takes $24,000 back in taxes that had already been paid. That's all Mr. Gambino knew about this money. He didn't know where it came from. He didn't know what it was related to. There's nothing about the Niles transaction. The first Niles transaction, someone made mention of a certificate of insurance that was needed to close that transaction. That was forged, too. I put on the testimony of Philip Talley, the broker. The insurance agent said, that's not my certificate. That one is forged, too. Every document in this case that purports to bear Mr. Gambino's signature is forged. It goes wrong. Letters of direction, the powers of attorney, everything in this case is forged. Talk for a minute about Mr. Koontz. Mr. Koontz is either way, the title is different. Look at the Laverne transaction he was involved in. That's the one where he actually ends up with the property in his name from a forged trustee deed in his name based upon a trust agreement which he signed purporting to have originated in 1962 in order to establish that he was refinancing the property. This is Mr. Koontz, an experienced real estate entrepreneur and attorney saying, well, I had no idea what was going on here. He was refinancing property not owned by him to receive money for his use which he then, looking for disbursement fees, cut up a third, a third, a third, between himself, himself, himself. There's not even an attempt to show any disbursements to Mr. Gambino. Well, there could have been a reason for that. A darker reason. There could have been a darker reason. Sure. I mean, he doesn't absolve Mr. Koontz from your allegations against him and what the trial judge ultimately believed, but the implications from the, at least, the way the attorneys for the Plaza Bank looked at at least the Niles transaction, separated from the others, but this focusing on the Niles transaction is that none of this would have occurred without the initiation of Mr. Gambino in desperate search for money. Oh, there's no question. He was attempting to refinance his property so that he could pay off tax obligations. I mean, his finances, even by his own admission, were a mess, right? So he had that rich, cash poor. That's why he was attempting to pledge these properties in order to secure the money to pay the IRS and live state taxes. That's what he was attempting to do. Well, that's one analysis of it. Another analysis of it was that it was a very, very complicated scheme so that the IRS would never discover he was getting money. Well, actually, that was Mark's next to Mr. Gambino because he had the property, you know? So if the IRS sees he has property, that's it at the end of the ballgame as far as the liabilities, right? One would think. So basically, it really didn't understand his situation at all. It didn't take that point of view. Then let's go to the transaction the Plaza was involved in and Washington Mutual. Well, Washington Mutual was the burner. The Plaza was involved in that. The second Miles transaction was the second Kedzie transaction. Look at what happens in the context of that. Mr. Wolfe enters into a so-called contract with Mr. Gambino to buy the Miles property for $200,000, when everyone knows it's worth $505,000. Supposedly, that's what he does. He enters into a similar arrangement regarding the Kedzie property, supposedly with Mr. Gambino, which Mr. Gambino signs his option to purchase it, supposedly. Pat Stewart's, too, by the way. Signs his option for no money, Mr. Gambino. Nearer than not. And who gets the right now to reacquire the property in the event they're able to do so? Mr. Kedzie. Mr. Coombs gets it. And this is all done between Mr. Wolfe and Mr. Coombs. So in essence, what was going on was they were then re-harvesting this property, and portions of it were being paid off to Mr. Wolfe, and a portion of the value was going to be paid off to Mr. Coombs, which succeeded in doing what he was trying to do. Okay. Is this 137 sanctions dispute between you and FASA still percolating? You guys got 10 of testing in your brief. Every, every... Maybe testing isn't the right word, but it struck me as being testing. My point of view, there was no dispute from the beginning of this case until now that the trustees' deeds, which were the source of the claim for title by FASA, by Oral, by WW Funding, by everybody on the defendant's side of the table, were all forged. Every one of those trustees' deeds was forged. There's no dispute about that from day one. The affidavits of the bank officers were supplied. The next were that. Yeah, but what's he supposed to do when this new evidence comes to light? He's the defendant in the case. He's not the plaintiff. But you were the one that provided all of this evidentiary material, so you weren't prejudiced by his failure to update. You already knew. You seem to have taken this duty to update, which is usually an imposition on the plaintiff, who bears the burden of proof, and transferring it to, in this case, the bank. And I didn't quite understand your rationale for using the duty to update in the case of the defendant when the evidence that you say he should have updated his interrogatory answers on was evidence that you already had in hand. He wasn't depriving you of any information you already knew. There was no disputed information anyway. It wasn't a question of depriving the defendant of information. They knew it from the beginning. It was a question of forcing them to go through a complete trial in order to get their property back when the only claim of title for the Plaza Bank, and everybody on the defendant's side of the table, were from three trustee's deeds which everyone knew, and no contrary evidence had been forged. Okay. I have one more question about the punitive. All the punitive issues are all still alive, too, I think. Absolutely. Now, the punitives were imposed on whom? The punitives were imposed on Dow, and neither of whom have prosecuted their appeals to completion. Right. The Coons defendants, WW Funding, and Mr. Wolf. Okay. And there was, by the way, there was a discrimination by the trial judge between the Coons defendants and Dow, and Mr. Wolf on the other side. And the punitives weren't imposed on Plaza? No. There was no standard title claim against Plaza. Right. Thank you. Who wants to go first? Mr. Metzger. Okay. Do you want to talk about the punitives for just a minute? Sure. That's a pretty heavy hit back there. I think it's argued in two or three of the briefs by multiple defendants, I think. I don't want to restate what's readily accessible to the court, but I think that there are a couple of aspects to the damages and the punitive damages. First of all, the damages themselves are wrong. There's no place for any kind of multiplier. This wasn't an award of attorney's fees. The damages in slanderous title are the costs in clearing the title and the paid and acquired title. That would include the attorney's fees. Now, you don't determine the attorney's fees by first having an award of attorney's fees, multiplying the attorney's fees, and having that become the damage. The law is cited in several of the briefs. Wasn't that Gambino's arrangement with his lawyers? Yes. He's a lone star figure. Yes, as I recall the arrangement. And it covers the attorney's fees. Why don't we get it for the punitive? I don't believe that that covers the attorney's fees because the damages are not an award of attorney's fees. The damages are the amount of the cost incurred. So you don't internally... But you made those arguments in your brief. You covered all that. The punitive damages would have to be based on findings with respect to punitive damages. The test that has now been discussed by many courts in Illinois and the U.S. Supreme Court about reprehensibility, the relationship between punitive damages and actual damages. I should point out that factually, that in this instance, the trial court assessed the punitive damages before it determined the actual damage. The punitive damages were assessed in the November 30th judgment. And it wasn't until the May 2nd judgment that the court actually determined what the actual damages should be. So there plainly could not have been any consideration of the correct factors for determining punitive damages. But the standard for punitive damages is different from the standard for the actual commission of the tort, the slanderous title. And the court never took that into account either. Many of the cases show that when that's the issue, that when there was a jury, that there were two separate instructions that were required. One for the finding of malice in the slanderous title claim and one for the finding of the willful and wanton conduct for the tort. But they're not the same. I'd like to quickly run through a couple of points relating to arguments. I'll get back to it very quickly. And actually, some of it concerns arguments by a fellow defendant as well. First point is that there was the statement argued that Walsh believed that Coons represented Gambino, was an attorney for Gambino. Yet at the same time, we need to realize that the argument in the testimony is that they had nothing to do with each other. They didn't have any communications and they didn't work together. So if Walsh had that belief, it certainly couldn't have come from Coons. Perhaps Sal said that, or perhaps it was just knowledge that Coons was an attorney. If there were no communications, no interactions, it had nothing to do with each other. Sal's never going to get rid of that all in your brief. You've covered all that in your brief. You're just repeating what you have in your brief. We've read your brief. We understand your argument, sir. OK. And I think what the court has to determine with respect to the Coons defense and the slander of the title point is where in the process of the flow of processing of a real estate transaction is a party involved in the publication of a disparaging document in the causing or participating publication. I mean, you went through that in your writing. I don't believe this is in your brief. Thank you. And then there was a comment made about Gambino's removing the properties from trust and that nothing had occurred. But that's not correct. Gambino obtained the documents in December. Then the first transaction occurred, the Niles transaction. Gambino was very involved in that transaction, as the court has recognized. Then there was a second transaction in January, the Kedzie transaction. And Gambino returned the deeds, the testimony was in January. And we don't know if that was before or after the second transaction, but it certainly was after the first transaction. So these transactions occurred while Gambino had these deeds and then went back and said that I'm not going ahead with the loans after he had already gone ahead with the loans. Well, somebody had to have the deeds or copies or facsimiles of the deeds in order for the subsequent two transactions to proceed because nobody was going to lend money on property in trust, right? Exactly. Without having the trustee sign off. Exactly. And of course, the trustee was nowhere to be found. So they were working basically off a representation that the deeds were legitimate. Exactly. And on that point, it should also be pointed out that these deeds didn't involve Gambino's signature at all. These were trustee's deeds. So the signers of these deeds. Which were also torturers. That was the testimony. I'm not disputing what that is. I'm just saying that that was the testimony. But we've gone through all this in your brief already. We don't need to re-hear this. You have two minutes and it's already gone. Yes. And I also wanted to indicate that with respect to the forgeries and the other, there was no conflicting expert testimony was presented. But that Gambino had provided the example, and the court recognized that. And the expert testified that she had failed to obtain a current sample of Gambino's signature. Namely, the check by which she was paid for her service. So she acknowledged her failure to do this. And beyond that, there was no determination of the source. We believe that the accused defendant did not cause or participate in publication of anything or act with knowledge or a high degree of awareness of the falsity of any of the documents that came to them. We would ask that the judgment or punitive damages against the accused defendant be set aside. Thank you, Mr. Metzger. Mr. Smith, anything else you want to add? No, I think your briefs are adequate for the task, unless there's something you want to stress. Mr. Carmichael. Counsel, the case was well-briefed and well-acted.